IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ADRIAN WADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 6876 |
| v. | ) | |
| | ) | |
| JAMES COLLIER JR., DONALD MOBLEY, | ) | Judge Virginia M. Kendall |
| DWAYNE WHEELER, and the VILLAGE OF | ) | |
| MAYWOOD, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Adrian Wade sued the Defendants James Collier Jr., Donald Mobley, and Dwayne Wheeler, each officers of the Maywood Police Department, together with their employer the Village of Maywood, Illinois for violating his constitutional right to equal protection under the laws pursuant to 42 U.S.C. § 1983, as well as for malicious prosecution under Illinois state law.[1] Defendants each move for summary judgment in their favor. For the reasons stated herein, Defendants' motions are granted and judgment is entered in their favor.

## FACTS

Wade joined the Maywood Police Department in April of 1994. (Collier/Mobley 56.1 at ¶ 1).[2] Each of the defendants are or were employed as police officers by the Village of Maywood.

---

[1] The Village of Maywood has been sued solely under the Illinois common law doctrine of *respondeat superior* and Illinois statutory indemnification.

[2] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Facts as follows: citations to the 56.1 Statement of Support of Motion for Summary Judgment filed by Defendants Collier, Mobley, and the Village of Maywood have been abbreviated to "Collier/Mobley 56.1 at ¶"; citations to Defendant Wheeler's Local Rule 56.1 (a)(3) Statement of Material Facts have been abbreviated to "Wheeler 56.1 at ¶"; citations to Plaintiff's Response to Defendants Collier and Mobley 56.1 Statement have been abbreviated to "Pl. Resp. to Collier/Mobley 56.1 at ¶"; citations to Plaintiff's Response to Wheeler's Local Rule 56.1(a)(3) Statement have been abbreviated to "Pl. Resp. to Wheeler 56.1 at ¶"; citations to Plaintiff's Amended Rule 56.1(b) Statement

(Pl. Resp. to Wheeler 56.1 at ¶ 2; Pl. Resp. to Collier/Mobley 56.1 at ¶2)[3]. At the time of the events at issue here, each of the Defendant Officers was acting in their official capacities on behalf of the Maywood Police Department. (Pl. Resp. to Wheeler 56.1 at ¶ 3).

   *Operation Pocket Change*

   The events at issue stem from a Maywood Police Department investigation known as Operation Pocket Change. (Pl. Resp. to Wheeler 56.1 at ¶8). Operation Pocket Change started after Officer Wheeler contacted the State's Attorneys' Office to report an incident with a known drug dealer, Hosie Thurman ("Thurman"), in which Thurman unsuccessfully tried to bribe Officer Wheelers and Cobos in exchange for leaving Thurman's drug dealers alone. (Pl. Resp. to Wheeler 56.1 at ¶¶ 9, 11, 12; Pl. Resp. to Collier/Mobley 56.1 at ¶ 5).[4] Additionally, an individual who was arrested by the Maywood Police Department in the summer of 2004 had indicated that Thurman had officers on his payroll. (Pl. Resp. to Wheeler 56.1 at ¶ 14, Wheeler 56.1 Ex. E at 7; Collier/Mobley Resp. to Pl. Add'l 56.1 at ¶ 25).

   Officers Wheeler and Cobos did not accept Thurman's offer, but rather reported it to Chief Collier, who reported it to the state's attorney's office and raised the possibility of setting up a sting operation. (Pl. Resp. to Collier/Mobley 56.1 at ¶ 6). The purpose of Operation Pocket Change was to find out who supplied drugs to Thurman, whom he used to sell the drugs, and which police officers, if any, were in communication with Thurman. (Pl. Resp. to Wheeler 56.1

---

of Facts have been abbreviated to "Pl. Add'l 56.1 at  ¶"; citations to Defendant Wheeler's Response to Plaintiff's Rule 56.1 Facts have been abbreviated to "Wheeler Resp. to Add'l 56.1 at ¶"; and citations to the response of Collier and Mobley to Plaintiff's Rule 56.1 Facts have been abbreviated to "Collier/Mobley Resp. to Add'l 56.1 at ¶."

   [3] The Court notes that Defendants Collier and Mobley attached as Exhibit A to their 56.1 Statement of Facts a purported copy of the First Amended Complaint. The document they filed is not a complaint from this case. However, Defendant Wheeler attached the proper First Amended Complaint as Exhibit A to his 56.1 Statement of Facts; therefore, the Court relies on Defendant Wheeler's Exhibit to substantiate Collier & Mobley's statement of fact.

   [4] Wheeler 56.1 ¶ 9 contains an incorrect citation to the record. The statement is supported by Ex. D Pg. 13, not Pg. 43.

at ¶13).   As part of the operation, Officer Wheeler and Officer Theodore Yancy worked undercover to gather evidence against Thurman and his drug operation, including via meetings they arranged with Thurman.  (Pl. Resp. to Collier/Mobley 56.1 at ¶¶ 6,7).

During the course of the Operation Pocket Change investigation, the State's Attorney's Office was involved in the process of obtaining a pen register, consensual wire taps, and electronic surveillance orders.  (Pl. Resp. to Wheeler 56.1 at ¶ 17).   The "pen register" allowed investigators to record information related to incoming calls, chirps or texts made or received by Thurman's cell phone.  (Pl. Resp. to Collier/Mobley 56.1 at ¶ 10).   During the investigation, there were numerous calls between Wade and Thurman that were recorded by the wire tap and pen register.  (Pl. Resp. to Wheeler 56.1 at ¶¶ 19, 20, Pl. Resp. to Collier/Mobley 56.1 at p 38).  Wade admits that at some point in 2004, he voluntarily gave Thurman his cell phone number.  (Pl. Resp. to Collier/Mobley 56.1 at ¶ 3).   Those recorded conversations between Wade and Thurman included discussions about Wade purchasing a bulletproof vest for Thurman (Pl. Resp. to Collier/Mobley 56.1 at ¶30), and a conversation between Wade and Thurman about Wade's ability to assist one of Thurman's drug dealers who had been stopped by the police.  (Pl. Resp. to Collier/Mobley 56.1 at ¶ 50).

The Operation Pocket Change investigation was coordinated  at the State's Attorney's Office by Assistant State's Attorney Daniel Reedy and investigator Maurice Macklin.  (Pl. Add'l 56.1 at Ex. C, Pg. 16; Pl. Resp. to Collier/Mobley 56.1 at ¶ 34).   During the course of the investigation, Lieutenant Mobley went to monthly meetings regarding Operation Pocket Change.  (Collier/Mobley Resp. to Pl. Add'l 56.1 at ¶77).   Chief Collier also attended Operation Pocket Change meetings.  (Collier/Mobley Resp. to Pl. Add'l 56.1 at ¶ 19).

Once the team noted the frequency of calls between Wade and Thurman, investigators determined that "tickling the wire" would help to determine the identity of any Maywood officers who were assisting Thurman. (Pl. Resp. to Wheeler 56.1 at ¶ 22; Pl. Resp. to Collier/Mobley 56.1 at ¶ 56). The investigators decided to put out false information at a roll call meeting and observe what, if anything, Wade would do with that information once disseminated. (Pl. Resp. to Collier/Mobley 56.1 at ¶ 57). The investigators decided to have Lieutenant Mobley notify his officers during a roll call that another police agency would be in the area of Maywood in which Thurman was known to operate, in hopes that the announcement would trigger calls between an officer and Thurman and "flush out" any officers providing protection to Thurman. (Pl. Resp. to Collier/Mobley at ¶¶ 42, 43).

The details surrounding the execution of the planned announcement to "tickle the wire" are the source of this suit. According to Defendants, the investigative team for Operation Pocket Change decided to make an announcement at the December 9, 2004 roll call that police activity would occur that afternoon around Thurman's grandmother's house – an area Defendants allege to have been known for Thurman's trafficking. Defendants claim that Officer Wheeler called Lieutenant Mobley on December 9, 2004 and told him to make the announcement that day, (Pl. Resp. to Collier/Mobley 56.1 at ¶ 16), and that Lieutenant Mobley made sure that Wade was in the room during the 3pm roll call and then made the planned announcement, specifically announcing that officers should stay out of the 100 block of 10th and 11th between 3 and 7 pm because an outside law enforcement agency would be conducting a drug operation there. (Collier/Mobley 56.1 at ¶ 17, 19). Macklin was notified on December 9, 2004, while standing in the wire room, that the announcement had been made. (Collier/Mobley 56.1 at ¶ 22).

4

Wade admits that he was present for some portion of the December 9, 2004 roll call but denies that any such announcement took place at the December 9, 2004 roll call. (Pl. Resp. to Collier/Mobley 56.1 at ¶ 18). In support of his position that there is no evidence of December 9, 2004 announcement, Wade cites to Lieutenant Mobley's own memorandum of the roll call announcement, of which three drafts exist. (Pl. Resp. to Collier/Mobley at Exs. A1, A2, A3). The first draft was originally drafted on December 15, 2004 and dated the roll call announcement as December 13, 2004; the roll call announcement date was changed to December 9, 2004 only in the subsequent drafts of the memorandum. *Id.* The officers listed as present at the meeting are different on each of the three memorandum drafts. *Id.*

While the statements at the December 9, 2004 roll call are in dispute, it is undisputed that Wade and Thurman spoke by phone at approximately 4:24pm the afternoon of December 9, 2004. (Wheeler 56.1 at ¶25; Collier/Mobley 56.1 at ¶ 27, Ex. H). Wade stated during the call to Thurman that there would be "a lot of people around granny's house until 7". (Pl. Resp. to Collier/Mobley 56.1 at ¶ 23). Thurman responded "I'll shut it down and lay low then." (Pl. Resp. to Collier/Mobley at ¶ 25). Wade does not deny that he made the recorded call and statement about "granny's house" to Thurman on December 9, 2004 or deny Thurman's recorded response, but rather denies that he made this call and statement as a result of any information gathered at the December 9, 2004 roll call. Instead, Wade justifies this call on grounds that Thurman was one of Wade's confidential informants and that he made the December 9, 2004 call and statement as part of his regular detective work to use Thurman as a contact for investigations and to "plant a mine." (Pl. Resp. to Collier/Mobley 56.1 at ¶26, Ex. B. ¶¶ 9, 11).

*The Arrest of Plaintiff*

The State's Attorney's Office, through Reedy, presented documents to the judge overseeing the wiretap to obtain an arrest warrant and search warrant for Plaintiff. (Pl. Resp. to Wheeler 56.1 at ¶ 29; Pl. Resp. to Collier/Mobley 56.1 at ¶ 48). Investigator Jeffrey Markvart, also with the State's Attorney's office, prepared a one page arrest warrant and criminal complaint. (Pl. Resp. to Wheeler 56.1 at ¶ 31). The information submitted to the judge to obtain the arrest warrant included the phone conversations from December 9, 2004, the phone conversations about the bullet proof vest, and the conversation about Wade's ability to assist one of Thurman's dealers with a police stop. (Pl. Resp. to Collier/Mobley 56.1 at ¶50). When the judge signed off on the warrant, the judge ruled there was probable cause to detain Wade. (Pl. Resp. to Wheeler 56.1 at ¶ 32). None of the Maywood officers who participated in the Operation Pocket Change operation were involved in the decision-making process that led to the arrest of Wade or the decision to place Wade under arrest. (Pl. Resp. to Wheeler 56.1 at ¶ 33; Pl. Resp. to Collier/Mobley 56.1 at ¶ 65). Wade was arrested on January 21, 2005 pursuant to an arrest warrant. (Collier/Mobley Resp. to Pl. Add'l 56.1 at ¶ 16). As Thurman and several other alleged co-conspirators had been arrested by that point as well, Operation Pocket Change ended in January 2005. (Collier/Mobley Resp. to Pl. Add'l 56.1 at ¶ 25; Collier/Mobley 56.1 at Ex. D, Pg. 29).

Assistant States Attorneys Reedy and Katherine Hufford prosecuted the case against Plaintiff. (Pl. Resp. to Collier/Mobley 56.1 at ¶ 9). A grand jury returned a true bill of indictment against Wade for criminal drug conspiracy. (Pl. Resp. to Wheeler 56.1 at ¶ 34; Wheeler 56.1 at Ex. D, Pg. 61). The three drafts of the memorandum about the December 9, 2004 roll call announcement that Lieutenant Mobley authored were never presented to the grand

jury, nor did any of the Maywood officers testify before the grand jury. (Pl. Resp. to Wheeler 56.1 at ¶ 35; Pl. Resp. to Collier/Mobley 56.1 at ¶ 67, 89). During the grand jury testimony, Investigator Macklin testified about several instances of contact between Thurman and Wade, including testimony about Wade supplying Thurman with a bullet proof vest (Pl. Add'l 56.1 at Ex. E, Pgs. 31, 33-34, the call from Wade to Thurman on December 9, 2004 about police activity in Thurman's area (Pl. Add'l 56.1 at Ex. E, Pg. 40), and the call from Wade to Thurman on December 12, 2004 alerting Thurman that one of his employees had been pulled over by a police officer (Pl. Add'l 56.1 at Ex. E, Pg. 48-49).

*Proceedings in People of Illinois v. Arian Wade, IL # 05 CR 4334*

On July 11, 2007, Plaintiff's criminal defense attorney filed a motion to suppress evidence in Plaintiff's criminal case, alleging that the search warrant application contained deliberate and material misrepresentations by Investigator Markvart. (Pl. Resp. to Wheeler 56.1 at ¶ 36). Specifically, the motion to suppress, referred to as the "*Franks* motion," cited to the fact that Markvart based his probable cause on the alleged December 9, 2004 roll call statement made by Lieutenant Mobley. The motion highlighted that the probable cause was based not on the actual statement but rather on a December 15, 2004 memorandum of that roll call which was referenced in a December 13, 2004 memo. (Pl. Resp. to Wheeler 56.1 at ¶¶ 36, 37).

The state criminal court overseeing Plaintiff's criminal case held an evidentiary hearing on the *Franks* motion on December 10, 2007. (Pl. Resp. to Collier/Mobley 56.1 at ¶79). During the evidentiary hearing, Plaintiff's criminal defense attorney argued that the officers involved in the investigation "worked backward and changed the date of the announcement from December 13 to December 9 because attendance records showed that Wade did not work on the 13th but did work on the 9th." (Pl. Resp. to Collier/Mobley 56.1 at ¶80). The state court specifically asked

Wade's criminal defense attorney how he could explain the recorded call between Wade and Thurman on December 9, 2004 to report police activity, to which Wade's criminal defense attorney replied that the call and the announcement were "a square peg in a round hole." (Pl. Resp. to Collier/Mobley at ¶¶ 81, 82). The state court denied Wade's *Franks* motion after finding that notwithstanding Lieutenant Mobley's "sloppy police work" the testimony of Macklin, Markvart and Wheeler that the statement was in fact made on December 9, 2004 was credible, such that Wade failed to show that Markvart knowingly or recklessly disregarded the truth in preparing his affidavit in support of the search warrant. (Pl. Resp. to Collier/Mobley 56.1 at ¶ 85, Collier/Mobley 56.1 Ex. K at 165). In his oral ruling denying Wade's motion to reconsider the ruling denying the *Franks* motion, the criminal court stated as follows:

> From what I heard and pleadings, certainly there is ample argument for impeachment of especially Commander Mobley and the manner in which he prepared the document. *But that doesn't get around the direct testimony of which Markvart and other officers were present for at the announcement and the alleged warning to Hosie Thurman by Mr. Wade that occurred on a particular date.* So I still don't believe that the defense has shown a knowing or reckless disregard for the truth. Motion to reconsider is denied.

(Wheeler 56.1 at Ex. H); (Pl. Resp. to Collier/Mobley 56.1 at ¶ 87) (emphasis added).

At Plaintiff's criminal trial, Officer Macklin testified that on December 9, 2004 Plaintiff was at roll call and later called Thurman to warn him that police would be present around Thurman's grandmother's house. (Collier/Mobley Resp. to Pl. Add'l 56.1 at ¶ 74, 86). Following a jury trial, Plaintiff was acquitted of all criminal charges on April 14, 2008. (Pl. Resp. to Wheeler 56.1 at ¶ 38).

### *Prior Proceedings in Federal Court*

On May 20, 2008, Plaintiff filed a multiple count suit against Defendants and other officers in federal court that was assigned to this Court. (Pl. Resp. Wheeler 56.1 at ¶ 44; *see also*

*Wade v. Mobley, et al.*, 08 C 2931 (N.D. Ill. May 20, 2008). The initial complaint included three federal claims pursuant to 42 U.S.C. § 1983, and was amended shortly thereafter to include additional pendant state law claims. (Pl. Resp. Wheeler 56.1 at ¶¶ 45, 46). This Court granted Plaintiff's March 16, 2009 motion to voluntarily dismiss the case in part, dismissed with prejudice the three federal claims then pending and declined jurisdiction over the remaining state law claims. (Pl. Resp. Wheeler 56.1 at ¶ 48). On March 20, 2009 Plaintiff filed a complaint in the Circuit Court of Cook County for malicious prosecution, false imprisonment, intentional infliction of emotional distress and conspiracy. (Pl. Resp. Wheeler 56.1 at ¶ 49). On September 10, 2009, Plaintiff amended his state court action to add a claim for violation of his rights to equal protection under 42 U.S.C. § 1983. (Pl. Resp. Wheeler 56.1 at ¶ 50), whereupon Defendants removed the action again to federal court. (Pl. Resp. Wheeler 56.1 at ¶ 51). On November 15, 2010, this Court granted Plaintiff's motion to withdraw several state court claims. (Pl. Resp. Wheeler 56.1 at ¶ 52). On March 3, 2011, this Court denied Defendants' motion to dismiss the equal protection claim on statute of limitations grounds, whereupon the remaining Defendants answered the claims now pending before this Court. [Dkt. 26, 28, 32].

## STANDARD OF REVIEW

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is warranted where no rational trier of fact could find for the non-moving party. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.

*Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court is not required to "draw every conceivable inference from the record - only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court will accept that statement as true for the purposes of summary judgment.   And adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter [;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

<u>**DISCUSSION**</u>

### I.     Equal Protection

Plaintiff's only federal claim is one for violation under 42 U.S.C. § 1983 of his Fourteenth Amendment constitutional right to equal protection under the laws.   Generally, equal protection claims involve charges of singling out members of a vulnerable group for unequal treatment attributable to the state.  *See LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010) ; *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004).  But it also bars state action that "irrationally singles out and targets an individual for discriminatory treatment"

as a so-called "class-of-one," although such claims are difficult to prove. *LaBella*, 628 F.3d at 941 (citing *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)); *see also McDonald v. Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). A plaintiff alleging a class-of-one equal protection claim must prove that a state actor intentionally treated him differently than other similarly situated individuals, and that there is, at a minimum, no rational basis for that difference in treatment. *See Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009); *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Because Plaintiff has presented no genuine issue of material fact regarding the existence of similarly situated individuals or the absence of a rational basis for prosecuting Wade, Defendants' motions for summary judgment on Wade's equal protection claim are granted.

### A. Plaintiff Presents Insufficient Evidence of Similarly Situated Individuals.

In order to prevail on a class-of-one equal protection claim, a plaintiff must present evidence of at least one similarly situated individual who is "prima facie identical in all relevant respects or directly comparable [to the plaintiff] … in all material respects." *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) (citing *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005)); *Sellars v. Gary*, 453 F.3d 848, 850 (7th Cir. 2005) (same). While the similarly situated analysis follows no precise formula, it is clear that "similarly situated individuals must be very similar indeed." *LaBella*, 628 F.3d at 942 (quoting *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)). Whether individuals are similarly situated to a plaintiff is generally a fact question for the jury; however, "a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *McDonald*, 371 F.3d at 1002.

11

In the context of wrongful investigation or prosecution, a plaintiff must show that other individuals not prosecuted were similarly situated "in relevant respects." *McDonald*, 371 F.3d at 1005. As the *McDonald* court noted in analyzing a factually similar situation to Wade's, in cases in which wrongful investigation or prosecution is the basis for the class-of-one claim, it is appropriate to draw on the law regarding "selective prosecution" claims. *See id*. Selective prosecution cases make clear that "in order for an individual to be similarly situated [for selective prosecution purposes] the evidence against the comparator must be 'as strong as or stronger' than that against the person arguing there has been an equal protection violation." *Id*. at 1006 (collecting cases). Individuals are similarly situated "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Id*. (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)).

Wade attempts to satisfy the "similarly situated" requirement through two different avenues. First, Plaintiff suggests that Officers Yancy, Wheeler, and Codos are similarly situated individuals in that they also accepted bribes from Thurman in exchange for information. Wade's position simply ignores the ample evidence in the record that Officers Yancy, Cobos and Wheeler were working undercover and hand-in-hand with the State's Attorney's Office on Operation Pocket Change at the time they accepted bribes from Thurman, and that their interactions with Thurman were part of that investigation and done at the direction of the investigators. *See* Wheeler 56.1 at Exs. RB-1, RB-2. The actions of Wade in interacting with Thurman, on the other hand, were by Wade's own admission unknown to the Maywood Police Department or Operation Pocket Change, and are uncorroborated other than his own statement that he had an undisclosed confidential informant relationship with Thurman.

Second, Wade attempts to show that he was treated differently by virtue of the fact that other than the December 9, 2004 memos, Lieutenant Mobley never backdated memos as a general practice; therefore, argues Wade, it can be inferred that Lieutenant Mobley treated Wade differently from all other officers about whom memos were written. This position fails to demonstrate "similarly situated" for two reasons. First, in support of this position, Wade points to three isolated memoranda written by Officer Mobley over a 5-year period that were not backdated or redrafted. Three memoranda written across a 5-year period is far from any type of studied approach to all memoranda written by Lieutenant Mobley and does nothing to refute Lieutenant Mobley's deposition testimony that that while backdating the December 9, 2004 memo was an anomaly he "wouldn't say it never happened" in other instances. (Mobley Dep., Pl. Add'l 56.1 at Ex. Q). Additionally, Wade's suggestion that the three other memos demonstrate similarly situated individuals who were treated differently is significantly undermined by the fact that one of the three memos to which Wade points is a memo *about Wade* on an unrelated issue, which memo Wade admits was not backdated. This undermines any insinuation that Lieutenant Mobley treated Wade differently from other individuals about whom he drafted memoranda.

Second, the memoranda argument generally is factually similar to the argument raised and rejected in *McDonald*. To meet his burden to show that similarly situated individuals had been treated differently, the *McDonald* plaintiff argued that he was similarly situated to every resident of the town that had been investigated following a residential fire, but that he was treated differently because his was the only investigation in which the fire department did not first rule out all non-arson causes before making a determination of arson. *See McDonald*, 371 F.3d at 1003-04. The *McDonald* court rejected this evidence for several reasons, including the

fact that the other investigations were for different fires with different evidence and different circumstances that could not be considered sufficiently similar to the fire that occurred at the plaintiff's home. *Id.* at 1004. Likewise, Wade presents evidence that Lieutenant Mobley did not change dates in three other memos, one about discipline of an officer, one about officers who had used up their sick time, and one about a 911 call. But these memos concern different subject matter than Lieutenant Mobley's memorandum about the December 9, 2004 incident. Additionally, there is no indication in the record that these three memoranda were at any point reviewed for accuracy. It is entirely possible that had they been reviewed, as was the December 9, 2004 memo, these other memos might have been determined to also contain errors and need redrafting. Like the plaintiff in *McDonald*, the facts surrounding the three memoranda have not been shown to be similar to those surrounding the December 9, 2004 memo, and it is therefore insufficient evidence of the existence similarly situated individuals who were treated differently.

### B. There was a Rational Basis to Prosecute Plaintiff.

Even assuming that the "similarly situated" requirement could be met, Plaintiff cannot meet his burden to present genuine factual issues as to the absence of a rational basis for Wade's prosecution. After satisfying a showing of similarly situated individuals, a plaintiff must be able to present a genuine issue of material fact as to the motive for the state actor's conduct. As discussed in the recent *en banc* opinion in *Del Marcelle v. Brown County Corp.,* the appropriate standard for determining a state actor's motive is presently in dispute in this circuit. *See Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (*en banc* plurality). The *Del Marcelle* court, sitting *en banc*, split as to whether class-of-one claims should be subject to a simple rational basis standard, or a rational basis standard together with a some evidence that the state actor acted with improper personal motivations, also described as animus. *Id.* Other

14

circuits have also split over whether animus is required to prove a class-of-one case. *See id. at* 892 (collecting cases).

In the case before this Court, however, that debate is moot. Even under the more lenient of the two *Del Marcelle* approaches Wade's claim fails because he cannot present a genuine issue of material fact that Defendants lacked a rational basis for their actions. "Class-of-one claims cannot rest on governmental activity that is discretionary by design, a good description of prosecutorial selectivity in criminal law." *Avila v. Pappas*, 591 F.3d 552, 554-55 (7th Cir. 2010); *Moore*, 543 F.3d at 900 ("Because a no-rational-basis challenge to the exercise of prosecutorial discretion is doomed to failure, [the defendant's] class-of-one argument is foreclosed for this reason as well."); *see also Murphy v Village of Plainfield*, -- F. Supp. 2d --, 2013 WL 169995 (N.D. Ill. Jan. 16, 2013) (*Avila* and *Moore* foreclose class-of-one claims that are based on a rational basis challenge to prosecutorial discretion). Indeed, it is apparent at this stage in the case that the facts supporting the class-of-one claim and the malicious prosecution claim entirely overlap, making it barred by the additional grounds that plaintiffs may not bring a state-law malicious prosecution claim under cover of a federal constitutional claim via § 1983. *Newsome v. McCabe*, 256 F.3d 747, 761 (7th Cir. 2001).

Even if *Avila*, *Moore*, and *Newsome* did not bar plaintiff from arguing no rational basis for prosecution as matter of law, the undisputed facts show probable cause for the arrest and prosecution of Wade. "Probable cause is a rational basis for official action" that will defeat a class-of-one claim. *Avila,* 591 F.3d at 554-55 (citing *Schor v. Chicago*, 576 F.3d 775, 778-79 (7th Cir. 2009). The entirety of Wade's case rests upon the December 9, 2004 memo, which Wade asserts create a genuine issue as to the validity of the testimony that Lieutenant Mobley made an announcement at roll call on December 9, 2004, and therefore impugns Mobley's, and

15

presumably therefore the other Defendants' motivations toward Wade when they participated in the investigation and prosecution of Wade. But Wade has shown no link between the December 9, 2004 memo, or the Defendants, and the indictment of Plaintiff. It is undisputed that none of the drafts of memo about the December 9, 2004 roll call were presented to the grand jury. It is also undisputed that none of the Defendants testified before the grand jury that indicted Wade. Wade was indicted by an independent third party grand jury on the basis of evidence other than the evidence about which Wade complains. Macklin, who is not a defendant in this case, testified before the grand jury about numerous instances of contact between Wade and Thurman, including, but not limited to, the December 9, 2004 call between Wade and Thurman alerting Thurman to police activity around the house. Macklin's deposition testimony in this case is consistent with his testimony at the *Franks* hearing that he was personally notified on December 9, 2004, while he was standing in the wire room, that the roll call announcement had been made. (Collier/Mobley 56.1 at ¶ 22).

Plaintiff's sole responses to this evidence are that he had a confidential informant relationship with Thurman that explains their frequent contact, and that the December 9, 2004 roll call is deliberate falsification of evidence by Lieutenant Mobley. A review of the testimony of Macklin before the grand jury reveals no reference to Lieutenant Mobley or the December 9, 2004 memo as the source of Macklin's knowledge that he presented to the grand jury. (See Pl. 56.1 Add'l Fact at Ex. E). Likewise, at the *Franks* hearing, the judge addressed the three memos and credited Markvart's testimony that he was present on December 9, 2004 at the wire room location during the period when the roll call announcement was being made together with the subsequent call that afternoon occurred between Wade and Thurman (Pl. Add'l 56.1 at Ex. O, Pgs. 69-71). And even assuming Wade's justification for his contacts with Thurman as a

confidential informant – a justification supported solely by Wade's affidavit - to be true, as required at this stage in the proceedings, it is nonetheless undisputed that Wade never told anyone at the Maywood Police Department or the State's Attorney's office about his relationship with Thurman. Without the Maywood Police Department or the States Attorney having known about Wade's purported confidential informant relationship with Thurman, they certainly had probable cause to perceive the continued contact and communication between Thurman and Wade as illicit.

To the extent that Plaintiff is in fact arguing that the search warrant for Plaintiff's residence, which may or may not have produced some of the other evidence that was presented to the grand jury (a fact which neither party has argued one way or the other) was obtained through the use of the December 9, 2004 memos, the validity of the search warrant has already been addressed by a court through the *Franks* hearing. The court hearing Plaintiff's criminal case expressly found during the *Franks* hearing that the testimony before it, which testimony was not provided by any of the Defendants, supported that the testifying officers had personal knowledge that the December 9, 2004 roll call announcement was made on December 9, 2004, notwithstanding anything written or not written in the December 9, 2004 memos. The judge adjudicating Wade's criminal proceedings made particular findings regarding the credibility of these officers and denied Wade's *Franks* motion to exclude evidence obtained from the search of Wade's home. Defendants have shown several avenues by which the prosecution in Wade's criminal case had probable cause to continue its investigation and prosecution of Wade, even taking the evidence about which Wade complains out of the picture entirely. Defendants' undisputed showing of probable cause defeats Wade's class-of-one claim regarding the Defendant police officers and their role in Wade's investigation, arrest, and prosecution.

17

## II.     Plaintiff's Malicious Prosecution Claim also Fails.

Plaintiff also has a pendant state-law claim for malicious prosecution.  As a general matter, where "the sole basis for invoking federal jurisdiction is nonexistent ... the federal courts should not exercise supplemental jurisdiction over [a plaintiff's] remaining state law claims." *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003). This rule, however, is subject to three exceptions: (1) when re-filing of the state claims is barred by the statute of limitations; (2) where substantial judicial resources have already been expended on the state claims; (3) and when it is clearly apparent how the state claim is to be decided. *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007).

In the present case, the issues between these two parties have been before this Court since 2008.  After dismissing the then-pending federal claims, the pendant state claims were dismissed for lack of jurisdiction and refiled in state court.   The claims were removed to this Court again as a new related case in 2010 after the filing of the equal protection class-of-one claim and have been litigated before this Court for nearly three more years.   The briefing for the summary judgment motion that is the subject of this Opinion lasted more than six months and generated more than 1,000 pages of record.   This, alone, might constitute the expenditure of "substantial judicial resources" on this case.   More importantly, in light of the discussion of probable cause above in the context of the equal protection analysis, it is clearly apparent how the state malicious prosecution claim is to be decided.  "If the district court, in deciding a federal claim, decides an issue dispositive of a pendant claim, there is no use leaving the latter to the state court."  *Williams*, 509 F.3d at 404 (quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994).   Therefore, this case falls into the exception for exercising supplemental jurisdiction in order to decide the malicious prosecution claim.

To establish a claim for malicious prosecution under Illinois law, Wade must show "(1) the commencement or continuation of an original criminal or civil proceeding by the defendants; (2) termination of the proceeding in his favor; (3) the absence of probable cause; (4) the presence of malice on the defendants' part; and (5) damages." *Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 863 (7th Cir. 2010) (citing *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 319 (Ill. 2006)). It is well-established that the existence of probable cause forms a complete defense to a malicious prosecution claim. *Logan v. Caterpillar*, 246 F.3d 912, 926 (7th Cir. 2001). "Under Illinois law, a grand jury indictment is *prima facie* evidence of probable cause." *Swearnigen-El*, 602 F.3d at 863 (citing *Bontkowski v. United States*, 28 F.3d 36, 37 (7th Cir. 1994); *see also Freides v. Sani-Mode Mfg. Co.*, 211 N.E. 2d 286, 289 (Ill. 1965).

Wade fails to rebut the existence of probable cause under Illinois law for the same reasons as he failed demonstrate the absence of a rational basis for his prosecution that defeated his class-of-one equal protection claim. Wade was indicted by a grand jury on the basis of testimony about numerous calls between Wade and Thurman, including but not limited to the December 9, 2004 call from Wade to Thurman about police activity in Thurman's area. Wade does not deny that he made the call to Thurman that was recorded by investigators, or deny the other calls between himself and Thurman that were also recorded as part of the investigation. Defendants sufficiently demonstrated probable cause to criminally prosecute Wade. As probable cause existed for the prosecution of Wade, his malicious prosecution claim fails.

## **CONCLUSION**

For the reasons stated herein, Defendants' motions for summary judgment are granted.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  September 6, 2013